IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

TRANSCRIPT OF PROCEEDINGS

```
----------------------------x
                             :
FREEDOM FROM RELIGION        :        CIVIL ACTION
FOUNDATION, INC., and JANE   :        NO. 1:17-cv-00642
DOE, individually, and on    :
behalf of JAMIE DOE,         :
                             :
          Plaintiffs,        :
vs.                          :
                             :
MERCER COUNTY BOARD OF       :        June 19, 2017
EDUCATION, MERCER COUNTY     :
SCHOOLS, and DEBORAH S.      :
AKERS, individually and in   :
her official capacity as     :
Superintendent of Mercer     :
County Schools,              :
                             :
          Defendants.        :
                             :
----------------------------x
```

MOTIONS HEARING

BEFORE THE HONORABLE DAVID A. FABER
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:          MR. MARCUS BENTLEY SCHNEIDER
                             Steele Schneider
                             Suite 700
                             428 Forbes Avenue
                             Pittsburgh, PA  15219

APPEARANCES (Continued):


For the Defendants:          MR. DAVID R. DOREY
                             MR. MICHAEL J. WALSH
                             O'Melveney & Myers
                             1625 Eye Street, NW
                             Washington, DC  20006

                             MR. HIRAM S. SASSER, III
                             First Liberty Institute
                             Suite 1600
                             2001 West Plano Parkway
                             Plano, TX  75075


                             MR. KERMIT J. MOORE
                             Brewster Morhous Cameron
                             P.O. Box 529
                             Bluefield, WV  24701


Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR


Proceedings recorded by mechanical stenography; transcript
produced by computer.

1                    P R O C E E D I N G S

2          THE COURT:  Good morning.

3      The case before the Court this morning is *Freedom From*

4  *Religion Foundation, Incorporated* against the *Mercer County*

5  *Board of Education*.  This is Civil Action 1:17-642.

6      May I ask the attorneys to please note their

7  appearances for the record?

8            MR. SCHNEIDER:  Your Honor, Mark Schneider on

9  behalf of the plaintiffs.

10           MR. MOORE:  Kermit Moore, Your Honor, on behalf of

11  the defendants.

12           MR. DOREY:  David Dorey, Your Honor, on behalf of

13  defendants.

14           MR. WALSH:  Michael Walsh, Your Honor, on behalf

15  of defendants.

16           MR. SASSER:  Hiram Sasser on behalf of the

17  defendants.

18             THE COURT:  You can be seated.

19      There are a couple things I want to place on the record

20  before we go any further.

21      First of all is why this case is -- this hearing is

22  being held in Beckley instead of Bluefield.  The courthouse

23  in Bluefield that was built in 1911 is currently undergoing

24  a rather thorough renovation, and that includes the complete

25  redesign of the courtroom.  That is on-going.  I don't

1    expect that to be complete and a courtroom to be available

2    in Bluefield until sometime toward the end of July.  So it

3    was not possible to hold this hearing in Bluefield where it

4    normally would have been held.

5         I moved it here.  This is the courtroom -- federal

6    courtroom that's the closest to the courtroom in Bluefield.

7    And I regret any inconvenience that may have caused anybody.

8         Secondly, I think it's appropriate for me to disclose

9    on the record that my wife is a retired Mercer County

10   schoolteacher.  She hasn't been employed by the Board for

11   years.  And she does receive a modest retirement income from

12   the state, but that won't be impacted one way or another by

13   the result in this case.  I do not see that as a conflict.

14        I am confident that it won't affect one way or the

15   other my ability to sit as a fair and impartial judge in

16   this case which I intend to do, but I felt like I should

17   disclose that, that fact.

18        The first thing I want to take up, there's a motion by

19   the plaintiffs in this case to proceed using pseudonyms and

20   for a protective order.

21        Let me ask if the defendants have any objection to me

22   granting that motion.

23             MR. DOREY:  Your Honor, we don't object to that

24   motion.  Of course, if this case was to go forward, and we

25   don't think that it should, we would hope that discovery

1  would be bifurcated so that we could assess the standing of

2  the plaintiffs who are using pseudonyms.

3      I would note even in that case, the names of two of the

4  plaintiffs are already publicly disseminated.  And, so,

5  while we would endeavor to use those pseudonyms in this

6  case, it already is the case that those folks are known in

7  the world.

8          THE COURT:  All right.  I'm going to grant that

9  motion now.  There's also a motion for protective order made

10 in conjunction with the motion to proceed using a pseudonym.

11     Have you reviewed that protective order?  Do you have

12 any objection to it?

13         MR. DOREY:  The Court's indulgence.

14     (Pause)

15         MR. DOREY:  We have no objection to the protective

16 order.

17         THE COURT:  All right.  I'm going to grant the

18 motion and I will enter that -- your proposed protective

19 order, Mr. Schneider.

20     Pending before the Court the, the principal motion is

21 the motion filed by the defendants to dismiss the first

22 amended complaint.  So I'll hear from you, Mr. Dorey, on

23 that motion.

24         MR. DOREY:  Would you like me to come to the

25 podium?

1          THE COURT:  Well, I might be able to hear you

2    better if you, if you come up there and use that microphone.

3    I do have the benefit of an immediate transcript here, so I

4    don't think that will be a problem.  But I think it would be

5    more helpful for you to be where you are.

6          MR. DOREY:  Very good, Your Honor.  Thanks very

7    much.

8       We're here asking to dismiss the first amended

9    complaint.  We represent three of the defendants who are

10   named in that complaint but not a fourth.  The --

11         THE COURT:  Which one do you not represent?

12         MR. DOREY:  Rebecca Peery who is a principal of

13   the school.  We understand that she has not been served with

14   a complaint and we don't represent her.

15         THE COURT:  All right.

16         MR. DOREY:  So our motion is only on behalf of the

17   other three defendants.

18         THE COURT:  Understood.

19         MR. DOREY:  We have moved to dismiss the complaint

20   in principal part because the plaintiffs who have brought

21   that complaint don't have standing to bring it.  They're not

22   the proper people who should be bringing this complaint.

23      They can easily be divided into two buckets of

24   plaintiffs.  The first is the Freedom From Religion

25   Foundation, which I would refer to as FFRF, and the Doe

1    plaintiffs, Jane Doe and Jamie Doe.

2              THE COURT:  If the other plaintiffs go out,

3    Freedom From Religion is out too; right?

4              MR. DOREY:  That's correct.

5              THE COURT:  They have to have a -- they have to

6    have an individual member who is a party.  Is that right?

7              MR. DOREY:  That's correct.  And Jane Doe is the

8    only member they allege in the complaint.

9              THE COURT:  And -- all right.  Go ahead.

10             MR. DOREY:  And the other bucket of plaintiffs are

11   the Roes and her daughter.  Those folks are in a -- are

12   really in a different posture all together.

13       I would start by first addressing FFRF and the Does

14   together because, of course, as you mentioned, Your Honor,

15   the standing of FFRF rises or falls with the standing of

16   Jane Doe.

17       The Does have never experienced the Bible curriculum of

18   which they complain.  When they filed their lawsuit, it was

19   at least seven months into the future when they would

20   potentially experience that curriculum.  Their lawsuit is --

21             THE COURT:  Are you familiar with *Lee* against

22   *Weisman*, the 1992 Supreme Court case involving the prayer at

23   a high school commencement, Mr. Dorey?

24             MR. DOREY:  I am familiar with that, Your Honor.

25             THE COURT:  How is that case different from the

1   situation you have here?  There was, as I understand it,

2   just an imminent probability that there would be a prayer at

3   the school and the Supreme Court said that was enough.  And

4   you have the same thing pretty much here, don't you?

5           MR. DOREY:  We don't.  In the first case, there

6   the plaintiff had already experienced the prayer of which

7   they were complaining and were filing a lawsuit to not have

8   to experience it again.  That's not the case here.  These

9   plaintiffs have never experienced it.

10      Also in that case it was really an up or down binary

11  question whether there was a prayer with which the school

12  was involved or not.  And, so, since it was very clear that

13  a prayer was going to happen, it didn't matter what that

14  prayer was about.

15      Here we have an entirely different situation where

16  Bible classes are allowed.  And, in fact, there's 50 years

17  of precedent that says so.  So really the question is not a

18  binary one, Bible classes or not, but instead what is taught

19  in particular Bible classes.

20      And given the nature of school curriculum, which is

21  reviewed on a regular basis and changed, we can't say seven

22  months ahead of time that someone is necessarily going to

23  experience a curriculum in the future that they know about

24  now.

25      And the reason why this is extra important has already

1  been demonstrated in this case because since the complaint

2  was filed, the Bible classes of which these folks are

3  complaining have been put on hold and actually will not come

4  back in the form that they knew about ahead of time.

5          THE COURT:  Okay.

6          MR. DOREY:  So because the particular curriculum

7  of which they're complaining doesn't exist and will not come

8  back, it only serves to further demonstrate that the

9  plaintiffs never had standing to begin with because when

10  they filed suit, it was necessarily speculative what would

11  be taught in the classes in the future.

12          THE COURT:  Well, the, the Roe plaintiffs had been

13  in a school and had been subjected to the, for want of a

14  better word, misconduct that the plaintiffs are complaining

15  about in this case, haven't they?  Wouldn't that at least

16  entitle that plaintiff to a claim for nominal damages based

17  on what's happened in the past regardless of where we go

18  from here?

19          MR. DOREY:  No, Your Honor, I don't agree.  These

20  folks have asked for, first, injunctive and declaratory

21  relief which the Roe plaintiffs are not entitled to because

22  they never say, using very artful pleading, that they do not

23  intend to come back to school in Mercer County.

24      So all that leaves is a claim for nominal damages.  And

25  there is no case law in the Fourth Circuit that would

1    support the notion that one can file a federal lawsuit just

2    for nominal damages.  Are we going to have a trial over six

3    cents or a dollar?  I don't think so.

4         There, there is no -- it doesn't meet the

5    redressability prong of standing.

6              THE COURT:  Is there any authority that they can't

7    file such a claim?

8              MR. DOREY:  There is authority outside this

9    circuit we have cited in our pleadings especially, for

10   example, a concurrence out of the Third Circuit in a case

11   that actually involves FFRF as well.

12        The judge there, the circuit judge discussed how if you

13   have a case from the outset that just says, "We want nominal

14   damages," this is effectively an admission, an admission

15   that we don't have actual damages because if we did, we

16   would have asked for them.

17        And, so, what it says from the get-go is we're not

18   injured.  All we have is nominal damages.  And, so, this

19   really is just a way of asking the Court to issue a

20   declaration that these plaintiffs were right.

21        But that's not the province of Federal Courts.  That's

22   not what Article III says should be the province of, of our

23   Federal Courts.  We shouldn't be spending judicial resources

24   to effectively issue an advisory opinion about whether what

25   happened in the past was constitutional or not when that

1   behavior did not, in fact, result in any injury.

2      It does not meet the redressability prong of the

3   standing analysis that's been discussed by the Supreme Court

4   in many cases going back decades, and especially recently in

5   *Clapper*.

6         THE COURT:  Wouldn't it be relatively easy for

7   your client to fix this problem in a manner consistent with

8   Supreme Court precedent?  Under the *Zorach* case, the

9   Court -- that was back in 1952 back when I was a little boy

10  and that's been a long time ago, Mr. Dorey.

11     The Court held that it was permissible to have

12  sectarian education during school hours if conducted outside

13  the school buildings.  And that -- in a recent, more recent

14  case, our Fourth Circuit Court of Appeals held in a case

15  coming out of South Carolina I think virtually the same

16  thing.

17     Then later and much more recently in the *Good News Club*

18  case the Supreme Court said it was permissible to have

19  religious instruction in the schools if done after regular

20  hours.

21     So the problem here is that the program as it exists,

22  regardless of whether it's sectarian or not, doesn't match

23  either one of those escape hatches.  And if you adopt it,

24  either one of them, you would be in the clear, wouldn't you?

25         MR. DOREY:  There is no doubt about that, but our

 1   client doesn't wish to offer sectarian education.  Our

 2   client wishes to offer education about the Bible in the

 3   context of history and literature and comparative religion

 4   such that people can learn about them and apply that

 5   knowledge to other things.

 6        That's what our client has always strived to do.

 7   That's what the West Virginia Attorney General in a memo in

 8   1983 said makes these kinds of classes during school hours

 9   permissible.  And their clients --

10             THE COURT:  Well, I understand all that.  But your

11   opponent says that if you look at the content of, of the

12   program as it has existed, you fall short of that, don't

13   you?

14             MR. DOREY:  That is certainly something that we

15   would dispute if this case would go forward except that

16   these plaintiffs are not the appropriate people to bring

17   that suit.

18        As I mentioned, of course, the Doe plaintiffs have

19   never experienced this curriculum and never will.  And the

20   Roes have a claim for nominal damages at best.

21             THE COURT:  What in your view is the impact on

22   this case of the recent suspension of the program?

23             MR. DOREY:  It has an impact insofar as it further

24   illustrates why the plaintiffs had no standing when they

25   filed their lawsuit, which is really the time that the Court

1  should be looking at; did they have standing when the

2  lawsuit was filed.

3      The fact that the program could be put on hold and

4  changed in the intervening months between when the complaint

5  was filed and now fully illustrates that the complaint at

6  the time it was filed was speculative.

7      But even further, it just goes to show that any lawsuit

8  that would continue from here on out is only further couched

9  in speculation because what lawsuit will we have?  What will

10  be adjudicated about a program that doesn't exist that

11  hasn't been experienced by the Doe plaintiffs at all?

12      THE COURT:  Well, you're putting all your eggs on

13  standing.  What -- do you have anything to say about the

14  mootness and ripeness doctrines and how they might apply to

15  this situation?

16      MR. DOREY:  I think the mootness and ripeness

17  question really comes about only when you've already

18  determined that plaintiffs have standing to bring a case.

19      So if they have standing, then we can discuss questions

20  of mootness and ripeness.  But we don't think that we ever

21  get to those questions because this lawsuit shouldn't have

22  started in the first place and needs to be dismissed from

23  the get-go.

24      As for the mootness question, if we're really going to

25  get there, we think the case would be moot because the -- I

1   mean, we can represent and it is clear from media accounts

2   that the curriculum that is complained about in the

3   complaint is over and is not coming back.

4           THE COURT:  All right.  What else do you have?

5           MR. DOREY:  If the Court was not inclined to find

6   that plaintiffs don't have standing, we also believe that

7   the complaint doesn't state a claim because it really asks

8   for not an injunction as against the particular curriculum

9   that used to be taught in these schools but, in fact, a

10  broad injunction that would seek to end Bible teaching,

11  teaching about the Bible in any form in Mercer County

12  Schools.

13      And we don't think that that's -- that is not a cause

14  of action.  Plaintiffs have at that point pled themselves

15  out of court.  And for a while, they had denied that this

16  was the case.  But ultimately in their sur-reply brief,

17  which was filed with the Court recently, they admit --

18      I would point the Court's attention to Document 33 on

19  Page 6.  They say, "The Bible cannot be taught in a

20  constitutionally permissible manner to elementary school

21  students."

22      This is what they're complaining about.  That's why

23  we're here today I think because even though the curriculum

24  they complained about is over, they still want to maintain

25  the suit because they're not really seeking an injunction

1    against the classes as they once stood, but really a

2    sweeping broad pronouncement from this Court that Bible

3    classes can't be taught.

4         We think that that flies in the face of decades of

5    precedent and shouldn't be countenanced.

6              THE COURT:  Well, I just told you -- I gave you

7    two ways that it could be taught; outside school property

8    during school hours and on school property after school

9    hours.

10             MR. DOREY:  That's true.

11             THE COURT:  The Supreme Court's addressed both

12   those things loud and clear.

13             MR. DOREY:  Right, assuming that the curriculum

14   was sectarian, it was religious education, which our clients

15   have not attempted to --

16             THE COURT:  I understand you don't admit that.

17             MR. DOREY:  -- provide, and do not intend to

18   provide in the future and have made clear that they're

19   reviewing this curriculum to ensure that whatever is offered

20   in the future complies with the rules.

21             THE COURT:  Let me ask you about Dr. Akers.  Under

22   the *Monell* case she's out of this case one way or the other,

23   isn't she?

24             MR. DOREY:  We think so.  They've attempted to sue

25   her in her individual capacity, but the complaint is devoid

1   of particular allegations against what her -- in her

2   individual capacity and, in fact, really mirrors a lot of

3   the language that the Supreme Court said was insufficient in

4   *Ashcroft* vs. *Iqbal*.

5           THE COURT:  All she's doing is implementing the

6   policy of the school board in her capacity as Superintendent

7   of Schools.  And under *Monell*, that shields her from

8   liability, doesn't it?

9           MR. DOREY:  We agree and so do plaintiffs because

10  they changed their complaint as between the initial and the

11  second removing the claims against Dr. Akers in her official

12  capacity.

13      Now they've attempted to sue her in her individual

14  capacity.  But the fact of the matter is they have no

15  allegations against her that are particular, but only

16  sweeping conclusions.

17          THE COURT:  Okay.

18          MR. DOREY:  The same is true under *Monell*

19  regarding the Mercer County Schools who are not a final

20  policymaker.  And, so, it's not clear why they belong in

21  this lawsuit in the first place.

22          THE COURT:  All right.

23          MR. DOREY:  In addition, the Mercer County School

24  Board, according to plaintiffs, has created this *Bible in*

25  *the Schools* program by policy.  But plaintiffs have failed

1    to identify a policy with particularity even though the

2    Fourth Circuit says that's required in any complaint to

3    state this kind of claim.

4        And, so, it should be dismissed for that reason as well

5    or, in the alternative, for failing to meet the requirements

6    of Rule 8 as articulated by the Fourth Circuit.

7            THE COURT:  Do you think the law is clear that I

8    have to decide the standing issue before I reach the

9    mootness and ripeness questions?

10           MR. DOREY:  I think that is a difficult question.

11   But it is clear to me because standing is the, the predicate

12   on which any lawsuit is based.  If you don't have standing,

13   then you cannot get to the next question because without

14   standing, the lawsuit should never have begun.

15       The Court doesn't have subject matter jurisdiction and,

16   so, cannot really reach out and grab the case and make a

17   decision as to whether it is moot or whether there's a

18   ripeness question.  But if the Court disagrees, we'd be

19   happy to have that discussion in more detail.

20           THE COURT:  Well, you say there's no standing for

21   Doe because he went to kindergarten and there's no guarantee

22   now that he'll be exposed if he goes into the first grade to

23   this program for a couple reasons because -- well, there's

24   no certainty that he'll actually attend the first grade and

25   there's no -- we don't know exactly what the content of the

1  program will be at that time.

2          MR. DOREY:  That's correct.  And, as a matter of

3  fact, when he attends the first grade this August, there

4  won't be a program at all because it's been suspended for at

5  least a year while the curriculum is redone.

6          THE COURT:  Well, he'll be in the second grade

7  when the suspension is over and they have a new program,

8  though.

9          MR. DOREY:  He may, although that program may not

10  be available in the second grade.  It's not clear at this

11  time.  It's entirely speculative as for what the school

12  board will decide.

13          THE COURT:  All right.  Thank you.  I'll hear from

14  Mr. Schneider.

15          MR. DOREY:  Thank you.

16          MR. SCHNEIDER:  Good morning, Your Honor.

17      I want to first address the characterization of the

18  complaint as somehow being -- failing as a matter of law

19  because it seeks too much.

20      It's very clear -- a review of the complaint makes very

21  clear that this is a challenge to the *Bible in the Schools*

22  program.  The claim for relief is a separate animal that

23  does not bear consideration in the Court's analysis of

24  12(b)(6).

25      The bottom line is the plaintiff is challenging this

1    program.  The plaintiff will seek the broadest possible

2    relief that the Court is willing to give.  But the defendant

3    is pressing the plaintiff to author that relief before this

4    case even gets under way.

5         That's -- that will be in the hands of the Court, what

6    relief is ultimately given, if any, in connection with this

7    claim.  And the defendant can point to no rules, Federal

8    Rules of Civil Procedure that require the plaintiff to plead

9    their relief in the manner that's being demanded in the

10   defendants' briefing.

11        And, so, I just want to make clear at the outset that

12   the plaintiffs are obviously charging -- challenging this

13   particular program.  And the relief that's requested will be

14   decided as this case proceeds.

15            THE COURT:  Okay.  How does Jamie Doe have

16   standing under the facts as they exist now?  Normally you --

17   the Court decides whether it has jurisdiction based upon

18   the, the case as pleaded at the time it's filed.

19        But the standing and mootness and ripeness are an

20   exception to that rule, as I understand it.  And changed

21   circumstances can compel the Court to look at the new

22   situation after the case is filed.  And if I do that, you're

23   in deep water here, aren't you?

24            MR. SCHNEIDER:  Well, Your Honor, I'll take

25   standing first because I think they need to be analyzed

1   separately.

2        I don't believe the standing analysis changes in any

3   way based upon the actions of the defendant.  Standing is

4   analyzed as of the time the case is filed both to the, to

5   favor the plaintiff as it might be if we're in hot water if

6   we consider these change in circumstances and to the

7   detriment of the plaintiff if the plaintiff later develops

8   standing after a case is filed.

9        By filing the case, the allegations in the complaint

10  essentially freeze in time what is being complained of.  The

11  curriculum -- a lot of emphasis by the defendants upon the

12  curriculum.  The complaint renders the curriculum static for

13  purposes of standing.  Standing only analyzes the ability of

14  these plaintiffs to bring a case as of the time the case is

15  filed.

16       And, so, none of these new facts that are brought into

17  this case by the defendants change the nature of this claim

18  as of the time it was filed.

19       Now, those facts may impact whether this case is ripe

20  or whether there's a mootness problem in this case.  And we

21  did spend some time in our sur-reply filing, addressing the

22  mootness issue.

23       When we look at mootness, the defendants have a steep

24  burden to show that by voluntarily stopping this program, it

25  is absolutely clear that this program will not start back up

1   again.

2        THE COURT:  The, the burden to prove mootness is

3   on the defendant.  The burden to prove ripeness is on you,

4   is it not?

5        MR. SCHNEIDER:  Well, Your Honor, I think the

6   ripeness burden would be on the plaintiff.  And I think

7   that -- just to finish the thought on, on mootness because I

8   think it bears upon the ripeness issue, the defendants have

9   failed to meet that burden on mootness for a number of

10   reasons.

11       First, we have media accounts.  That's really all that

12   we have to deal with here on the action taken by the school

13   district.  And I don't think the parties or the Court should

14   be put in a position of making a decision like this, a

15   weighty decision like this based upon media accounts.

16        THE COURT:  Well, it would be -- if the media is

17   accurate, it would be a real simple matter for the school

18   board to put those facts in evidence, wouldn't it?

19        MR. SCHNEIDER:  Well, I suppose it would.  But I,

20   I think that precisely what the defendant plans to do in

21   this one-year suspension is, is very important.

22       Some of the comments suggest that this is really a

23   stall tactic; that the hope is to bring the program back;

24   the hope is to include religious leaders in an effort to, to

25   maintain as much religiosity as there is in this program

1    and, and move forward with it.  At least that's what we're

2    left to conjecture about when we only have media accounts.

3        But to, to assess the ripeness issue, I think we would

4    really need to be able to conduct some discovery on that

5    topic to understand exactly what the district's plans are

6    with respect to this program.  I don't think we can really

7    guess at that based upon media accounts.

8        And I think the defendants would, would be -- would

9    need to come forward with clear, a clearer picture of what

10   the plan is so that the Court can assess the likelihood that

11   this program will come back in some form either the same or

12   very similar to its structure as of the time that the case

13   was filed.

14           THE COURT:  Well, in the *Abbott* case the Supreme

15   Court set down a two-part test for ripeness.  And the second

16   part of that test was whether there would be hardship to the

17   parties if judicial relief is denied at this point.

18       What hardship is there here to your clients if relief

19   is denied at this point when once a new program is put in

20   place, you can come back and file a new lawsuit?

21           MR. SCHNEIDER:  Well, the, the harm is really the

22   uncertainty which is, is, is not a small thing in these

23   cases.

24       The plaintiff, Jamie Doe, filed this case basically as

25   late as possible before entering into first grade if he were

1    to have wanted to obtain some preliminary injunctive relief

2    to stop the program before the exposure.

3        And that's, that's a right that a plaintiff has.

4    That's well established.  A plaintiff can seek injunctive

5    relief for future injury as long as that's --

6            THE COURT:  That's the *Lee* against *Weisman* case

7    that I talked about a minute ago I think.

8            MR. SCHNEIDER:  Correct.  And, so, by not being

9    able to challenge the prospective program returning, the

10   plaintiff will be likely forced to experience this, this

11   program and the constitutional injury associated with the

12   provision of, of this class.

13           THE COURT:  So you're saying the hardship is the

14   uncertainty attendant to not knowing whether there's going

15   to be a program and what it's going to be like and so forth

16   while he's in the first grade.

17           MR. SCHNEIDER:  The uncertainty and the inability

18   to challenge the program before the, the harm of being

19   exposed as was sought initially when this case was filed.

20           THE COURT:  Okay.  What's the hardship to Jessica

21   Roe?  She's going to school in Tazewell County now, isn't

22   she?

23           MR. SCHNEIDER:  Yes, she is going to a different

24   school.  I'm honestly not sure which school, Your Honor.

25       So the, the standing analysis for the Roe plaintiffs

1    and the Doe plaintiffs aren't as -- is not as different as

2    the defendants would suggest.  The --

3              THE COURT:  Well, my point, going back to the

4    ripeness issue, is that the hardship you describe for Jamie

5    Doe does not exist for Jessica Roe, does it?  There's no

6    uncertainty there if she's in school somewhere where there's

7    no *Bible in the Schools* program and no threat that there

8    will be.

9              MR. SCHNEIDER:  Well, I think she would be

10   similarly situated from the standpoint that the, you know,

11   more time that goes by where she is not able to attend

12   classes in her home district, the, the plaintiffs are

13   basically put out.  They are required to undertake these

14   burdens because of the lingering uncertainty over whether

15   this program will return and what changes will be made.

16        So the plaintiff -- in order to avoid the prospect of

17   having to pull Jessica out of the district again if the

18   program returns just as it is or with slight changes, those

19   plaintiffs would be required to continue to take the

20   avoidance steps being actively taken at this time in order

21   to avoid that sort of yo-yoing back and forth that could

22   result from making a decision to move her back to the home

23   district only to then potentially have to remove her again.

24              THE COURT:  Okay.  How do you maintain your suit

25   against Dr. Akers under the *Monell* doctrine?

1          MR. SCHNEIDER:  Well, Your Honor, individual

2    liability is available if there are actions taken by, --

3          THE COURT:  I'm sorry.  I interrupted you.  Go

4    ahead and finish your thought.

5          MR. SCHNEIDER:  -- by the individual under the

6    color of state law.  And this program, long-standing program

7    with Dr. Akers at the helm for a considerable amount of, of

8    the time here, she is basically the mechanism through which

9    this program is instituted and brought to the students.

10        And, so, in that respect, her individual actions are,

11   are largely responsible for this program being brought to

12   life.

13         THE COURT:  I don't see how you get to that point

14   if she in her official capacity is merely implementing a

15   program that the school board has put in place.  What has

16   she done in her individual capacity that she hasn't done in

17   furtherance of the policy of the, of the school?

18         MR. SCHNEIDER:  Well, it's, it's the action under

19   the color of law, under the color of state law.  So, so --

20   under the color of the state.  So it's certainly actions in

21   her capacity as superintendent, but it is implementing and

22   carrying out the program in that capacity.

23         THE COURT:  Well, I don't think that gets you

24   around *Monell*, but maybe it does.  I'll take a closer look

25   at it.

1      Going back to Jessica Roe, you haven't alleged in the

2    complaint that she would come back to Mercer County if this

3    program is done away with, have you?

4           MR. SCHNEIDER:  We have not, Your Honor.  And I

5    don't think that that's necessary.  I think it's absolutely

6    unrealistic to expect a plaintiff to do that earnestly.

7      Part of the problem is, you know, a lot of the

8    challenge here is that the plaintiffs haven't said the magic

9    words.  And I'd ask the Court to look past that and, and

10   consider the substance of what's being alleged here.

11     It's not realistic to, to require Elizabeth Deal to

12   consider every possible way in which this case might be

13   resolved to make a decision preemptively on speculative

14   circumstances about whether Jessica would return to the

15   district.  It's enough that she is, as it currently stands,

16   deprived of the ability to do that without consequence in

17   her home district.

18     And, so, you know, I think from the complaint it's

19   clear that there's a, a strong objection to the offering of

20   these classes leading to removal from the classes and

21   eventually removal from the district to, to avoid those

22   classes.

23     And I think the, the inability to freely without

24   consequence send Jessica to her home school district is

25   sufficient.  Whether -- depending upon the nature of the

1  relief in this case, Elizabeth would make the decision to

2  send Jessica back, I don't think any person could reasonably

3  speculate about, you know, whether that decision would be

4  made in a particular way given the uncertainty as to the

5  precise nature of the relief.

6       THE COURT:  Well, the fact that that's all

7  speculative cuts against you more than it does your opponent

8  here, doesn't it?

9       MR. SCHNEIDER:  I don't think so, Your Honor.  I

10 think the, the defendants have conceded that if Jessica were

11 in the district still and opting out of the Bible class that

12 she would have standing.

13     This is only really a difference of degree moving from

14 removal from the class to removal from the district to avoid

15 the adverse consequences of opting out of the class.

16     So this is really no different than if -- this is no

17 different than, in any meaningful way as far as standing is

18 concerned, from if Jessica were still in the district.  It's

19 just a different type of avoidance.

20     And she should be able to freely have the choice to

21 either re-enroll in her home district or stay in the other

22 district without the influence and without the impact of

23 these, these courses upon that decision.

24       THE COURT:  Okay.  Jamie Doe's parent or guardian

25 is a member of your corporate plaintiff, the Freedom From

1   Religion Foundation.  It's my understanding, and maybe I'm

2   incorrect, that Jessica Roe's parent or guardian is not.  Is

3   that right?

4           MR. SCHNEIDER:  That's correct, Your Honor.

5           THE COURT:  Well, doesn't that knock the Freedom

6   From Religion Foundation out of the water with regard to the

7   claim of Jessica Roe?  Doesn't the -- doesn't a plaintiff

8   here have to have -- I mean for, for Freedom From Religion

9   to be a proper plaintiff, don't they have to have a member

10  involved?

11          MR. SCHNEIDER:  That's correct, Your Honor.  And,

12  so, that member -- the only member as the case is, is

13  currently structured is Jane Doe.  So the, the

14  organizational standing rises and falls with the Doe

15  plaintiffs.

16          THE COURT:  Okay.  So Jessica Roe, I guess, could

17  still be a party in her own right but not a representative

18  of the Freedom From Religion Foundation.  Is that right?

19          MR. SCHNEIDER:  That would be correct.  And

20  theoretically, Your Honor, I guess if the nominal damages

21  claim that you talked about briefly with the defendants were

22  to remain in the case, that would be the case, and if I

23  could speak just briefly to that claim.

24      The *Covenant Media* case in the Fourth Circuit, while

25  not resolving this issue, certainly hints at nominal damages

 1   being sufficient.  And there are some cases cited in that

 2   case that do the same.  This really is an unresolved issue.

 3        And, so, I think it's, it's important to look at

 4   Justice O'Connor's concurrence in the *Farrar* vs. *Hobby* case

 5   for some guidance on this issue.  And Justice O'Connor

 6   observed that in certain cases, nominal damages are more

 7   meaningful than in other cases.

 8        The issue there was whether a party was a prevailing

 9   party under 1988 for attorney's fees.  And, and Justice

10   O'Connor's observation was that in that particular case

11   where the plaintiff sought $17 million from a slew of 10 or

12   11 defendants and got one dollar from one defendant, that

13   party was not a prevailing party under 1988.  But the

14   analysis made reference to consideration of the

15   meaningfulness in a particular situation of nominal damages.

16        The reality in these sort of cases involving psychic

17   and spiritual injury is that a plaintiff is typically not

18   able to show damages from a compensatory standpoint.  And,

19   so, in these cases there is much greater meaning to nominal

20   damages than in a case where compensatory damages are

21   sought.  And sort of a fall-back position is, well, you

22   know, there was liability and, you know, we'll give you six

23   cents.

24             THE COURT:  If, if I agree with you that Jessica

25   Roe has a claim for nominal damages, does that require me to

1  go into the thicket of looking at this program and making a

2  judgment as to whether it's sectarian or non-sectarian?

3        MR. SCHNEIDER:  I think if, if Jessica or --

4        THE COURT:  If the Court says it's

5  non-sectarian --

6        MR. SCHNEIDER:  If Jessica Roe's claim with

7  standing I think -- claim went forward, I do think that the,

8  the whole of the considerations involved here --

9        THE COURT:  I'd have to look back at the program

10  the way, in its form at the time she was a student in the

11  school, wouldn't I?

12        MR. SCHNEIDER:  For nominal damages, yes, Your

13  Honor.

14        THE COURT:  Okay.  What else do you have?

15        MR. SCHNEIDER:  Just my final note would be on the

16  issue of -- unless Your Honor has anything else from me, my

17  final note would be on the issue of municipal liability of,

18  of the Board.

19     We cited to case law and I think it's fairly clear that

20  you can proceed under a custom, policy, or a decision of a

21  final policymaker where neither of those two exist.  It's,

22  it's a disjunctive situation.  It's not that you must point

23  to a particular decision by a particular final policymaker

24  in all cases.

25     There's very clearly at an absolute minimum a custom

1   here of this course to the tune of 75 years of history, 30

2   years in its current iteration.  And we think it's very

3   clear that the Board of Schools has approved of this program

4   and implemented this program.

5        And through the general policies of implementation of

6   curriculum we pointed to and the long history of the

7   program, we think that we've more than met the pleading

8   standard for a municipal liability claim against the,

9   against the school.

10           THE COURT:  Okay.  Thank you, Mr. Schneider.

11       Mr. Dorey, do you want to respond to any of that?

12           MR. DOREY:  Yes, please, Your Honor.

13       You heard from Mr. Schneider during his argument a lot

14   of phrases that really go to indicate that his plaintiffs

15   don't have standing to bring this case.  He said things like

16   being likely forced to experience something in the future, a

17   harm -- he said the harm is the uncertainty.

18       These only further indicate that we cannot have a case

19   when plaintiffs haven't experienced something that now

20   doesn't exist.  These folks didn't have standing from the

21   get-go.  They don't have standing now.  Their case must be

22   dismissed.

23       A couple of follow-up points, especially with respect

24   to the question of Jessica Roe.  Plaintiffs during argument

25   said that so long as Jessica Roe and her mother have the

1  power to re-enroll her in school essentially that there is a

2  live case here and the Court can adjudicate an injunction.

3      This contradicts the Supreme Court's opinion in *Lewis*

4  vs. *Continental Bank Corp.*, which we cite in our papers,

5  Document 26 at Page 18, 494 U.S. 472 at 479.

6          THE COURT:  It's within the rule of *Doremus* too,

7  isn't it?  It's been the law since 1952.  In that case the

8  student graduated before the case came to, came into the

9  court.  And isn't that similar to the fact that this student

10  isn't in the school anymore?

11          MR. DOREY:  It is similar although slightly

12  different because that student probably couldn't come back.

13  It is in theory possible that Jessica Roe could come back to

14  school.  But the Supreme Court has held the mere power to do

15  something again is not an indication of an intent to do so.

16      And unless you have an intent to do so, you cannot get

17  declaratory and injunctive relief because the plaintiff,

18  quote, "must establish that it has a specific live

19  grievance."

20      The amended complaint goes out of its way to plead that

21  the *Bible in the Schools* program was a reason that Jessica

22  Roe was placed in school elsewhere, leaving one to believe

23  or to question what are the other reasons.

24      If the *Bible in the Schools* program was the only reason

25  she went to school somewhere else, it should be pretty easy

1   for these folks to say if the *Bible in the Schools* program

2   is changed or different or gone, then we will -- we intend

3   to re-enroll Jessica.  But they refuse to say that which

4   really is fatal to their claims.

5          THE COURT:  Let me ask you this.  Can I consider

6   the fact that -- appears to be a fact that this program has

7   been suspended and it's under review when -- or am I stuck

8   with the record I have before me?

9          MR. DOREY:  I don't believe that you're stuck with

10  the record before you.  And, in fact, we have made a record

11  in our reply brief that explains to the Court what is going

12  on presently.

13     I believe we're allowed to do that because we've

14  essentially said plaintiffs don't have standing and the

15  allegations in the complaint aren't true at least as of now.

16     This, this idea that the facts in the complaint are

17  static as for standing, I'm not certain that plaintiffs are

18  able to point to any case that says that that's so.  In

19  their papers I don't see it.

20     Certainly you would evaluate standing as of the time

21  that the complaint was filed.  But the fact is the changed

22  circumstances indicate that they didn't have standing as of

23  the time the complaint was filed.

24     So I think we need to look at the whole thing to then

25  decide whether when this complaint was filed in January

1    initially as for the Doe plaintiffs whether they had

2    standing then.  They didn't because their claims were

3    speculative at that time.  They're speculative then and

4    they're speculative now, even more so now.

5           THE COURT:  Well, the nominal damage claim is not

6    speculative because assuming that Jessica Roe wins on the

7    merits and this is a religious -- unconstitutional religious

8    program and she was exposed to it, then that's a concrete

9    injury however slight, isn't it?

10          MR. DOREY:  It may be an injury, but I don't know

11   that it's justiciable because it doesn't meet the third

12   prong of the standing test which is that whatever comes out

13   of a lawsuit, redress an injury.

14       And I'll refer the Court to *Utah Animal Rights* vs. *Salt*

15   *Lake City*, 371 F.3d 1248 at 1264, also in our papers at

16   Document 26, Page 19.  This is Justice McConnell concurring.

17       "Nominal damages are damages in name only, trivial sums

18   such as six cents or one dollar.  They do not purport to

19   compensate for past wrongs.  They are symbolic only.  The

20   question, as with declaratory judgment actions involving

21   past conduct, is whether an award of nominal damages will

22   have practical effect on the parties' rights and

23   responsibilities in the future.  A declaratory judgment

24   action involving past conduct that will not recur," as here,

25   "is not justiciable.  Labeling the requested relief nominal

1   damages instead of declaratory judgment should not change

2   the analysis."

3              THE COURT:  What case is that?

4              MR. DOREY:  This is *Utah Animal Rights Coalition*

5   vs. *Salt Lake City Corp.*, 371 F.3d 1248 at 1264 through

6   1266, Tenth Circuit 2004; in our papers ECF Number 26 at 19

7   to 20.

8              THE COURT:  That's a Tenth Circuit case?

9              MR. DOREY:  That's correct.

10             THE COURT:  That's not binding on me, but I can

11  give it such authority as I think it deserves.

12             MR. DOREY:  That's right.  We believe it's highly

13  persuasive as is the concurrence in the Third Circuit

14  involving FFRF, as is the Second Circuit case *Kerrigan* vs.

15  *Boucher*, 450 F.2d 487, 489 to 490.

16             THE COURT:  The only recent Fourth Circuit case is

17  the South Carolina case; right?  And that's -- that really

18  doesn't help us much because that *Bible in the Schools*

19  program was taught off school property.

20             MR. DOREY:  That's correct.  And in that case,

21  it's really a mootness analysis.  Once a case has gotten

22  going, if it turns out that actual damages fall away, then

23  we're not going to get rid of the case for that reason

24  alone.

25        There's really with mootness, I think, a question of

1  some costs; let's go ahead and finish.  But if you're

2  admitting from the outset of a case that you don't have

3  damages, then the case should never begin.  And I agree with

4  plaintiffs that this is not settled in the Fourth Circuit,

5  but we would like to settle that question.

6          THE COURT:  Okay.  Let's take a break.  I want to

7  talk to my lawyer here before we complete this hearing.  So

8  we'll be in recess for a few minutes.

9      (Recess taken from 10:45 a.m. until 10:52 a.m.)

10         THE COURT:  Mr. Dorey, I have one other thing I

11  want to pursue with you.

12         MR. DOREY:  Yes, Your Honor.

13         THE COURT:  You're saying that the Doe plaintiff

14  doesn't have standing because he hasn't enrolled in school

15  and been subjected to this program.  The program's been in

16  effect since 1986 in its form it was in before it was

17  suspended if I understand the facts correctly.

18         MR. DOREY:  That's what plaintiffs have alleged to

19  my understanding.

20         THE COURT:  Yeah.  Well, doesn't that make the,

21  the injury imminent enough for him to have appropriately

22  brought this suit even though he hasn't actually been in

23  school under the program?

24      There's just a short window of time here before it

25  looks like he will be exposed to this -- would have been

1    exposed to this program had it not been for this lawsuit.

2    And does, does he have to wait until he's actually injured

3    to bring the case for an injunction or can the impending

4    injury give him standing to try to avoid that injury by

5    getting an injunction?

6           MR. DOREY:  He could file a lawsuit ahead of the

7    injury.  That much is clear.  But the Supreme Court has also

8    made clear that the injury must be certainly impending.  And

9    if it's not certainly impending, then it's not sufficient of

10   an injury and doesn't confer standing to get to court.

11      Certainly I would refer the Court to *Beck* vs. *McDonald*,

12   a Fourth Circuit case of this year, 848 F.3d at 276

13   discussing the Supreme Court's decision in *Clapper*.

14      "We read *Clapper's* rejection of the Second Circuit's

15   attempt to import an objectively reasonable likelihood

16   standard into Article III standing to express the

17   common-sense notion that a threatened event can be

18   reasonably likely to occur but still be insufficiently

19   imminent to constitute an injury-in-fact."

20          THE COURT:  But they're not threatened now because

21   of the suspension of the program assuming that that matter

22   is before the Court properly which is not entirely clear.

23          MR. DOREY:  Correct.  And the fact that the

24   program could be suspended and changed in the time in

25   between which the lawsuit was filed and when the student

1  would have experienced it just goes to show all the more

2  fully that it was speculative because it could have been

3  changed because school programs' curriculum are changed all

4  the time.

5      We've pointed in our briefs to good authority that says

6  school principals and teachers on the regular reconsider

7  curriculum.  There's West Virginia law that requires that to

8  happen.

9      So it's no surprise that this could be reviewed, would

10  have been reviewed, will be reviewed.  I think that for this

11  plaintiff to have standing, he needed to wait longer to be

12  about to, imminently to experience the program, file a

13  lawsuit, and file, if he wanted to at that time, for a

14  preliminary injunction.

15          THE COURT:  Okay.  Let's go back to the point we

16  touched on a moment ago.  Do I have to decide the standing

17  issue based on the status of the case as it was originally

18  filed or can I look at changed circumstances?

19          MR. DOREY:  I believe that you can look at changed

20  circumstances at least to illustrate further that plaintiff

21  did not have standing at the time he filed his lawsuit.  And

22  I do not believe that plaintiffs can point to any case that

23  says that the Court cannot look at changed circumstances to

24  evaluate that question.

25      Certainly, standing is evaluated at the time the

1  lawsuit was filed.  But those changed circumstances here

2  illustrate why the plaintiff didn't have standing from the

3  get-go.

4      I also think that there are ways to lose standing as

5  lawsuits go on.  But here I don't believe that standing ever

6  attached in the first place.  So we don't need to go there.

7          THE COURT:  Okay.  Let me hear from Mr. Schneider.

8  Do you want to address anything on this limited subject that

9  I just brought up with Mr. Dorey, Mr. Schneider?

10          MR. SCHNEIDER:  I do, Your Honor.

11      To respond to the statement that plaintiff hasn't

12  pointed to any case law to support the argument that the

13  complaint renders the facts static for purposes of standing,

14  I would respond as follows.

15      It's very clear, and the parties agree, that standing

16  is considered as of the time a case is filed.  There's ample

17  case law where plaintiffs didn't have sufficient contact

18  with an unwanted religious display or exercise at the time

19  the case was filed, had contact with the display or exercise

20  after the case was filed, and attempted to bootstrap that

21  later conduct into standing at the outset.  That's been

22  rejected because standing is evaluated at the outset.

23          THE COURT:  Do you have those cases in your brief?

24          MR. SCHNEIDER:  I don't, Your Honor.  I, I could

25  probably in a couple minutes come up with one, but I know

1    from prior cases that there are ample cases where that's the

2    case.

3         And I, I don't think that the defendants would dispute

4    that if -- for example, Your Honor, if, if a delay had

5    occurred in this case and we were not having this hearing

6    prior to the start of the next school year, I don't think

7    the defendants would say that the plaintiffs' argument for

8    standing now considers the fact that Jamie Doe experienced a

9    day or a week or a month of the program.  They would force

10   the plaintiffs to be frozen in time as of the time the case

11   was filed.

12        I see no reason the defendants should be treated any

13   differently.  Both of -- both obligations to either side

14   arise from the simple notion that standing is considered as

15   of the time that a case is filed.

16        The other problem with allowing the consideration of

17   new facts is that it runs afoul of all of the developed case

18   law on voluntary cessation and how that is considered under

19   the mootness doctrine where defendants have a heavy burden

20   to show that a challenged exercise will not -- is absolutely

21   clear it will not happen again.

22        What the Court would be inviting by distinguishing this

23   situation from voluntary cessation situations is saying,

24   "Defendants, if you cease your conduct voluntarily soon

25   enough, i.e. before you're out of the pleading stage, well,

1    we'll consider it under a totally different standard

2    understanding.  But if it's after the pleadings close, well,

3    now you have this uphill battle to show that it's absolutely

4    clear it will not happen again under the mootness doctrine."

5        The same rationale that applies to holding the

6    defendants to that standard under mootness and voluntary

7    cessation applies now as well.  You would otherwise create

8    an easy out for defendants to get in these sort of file,

9    change the conduct, renew the -- after the case is, you

10   know, dismissed, renew the conduct again.  Precisely the

11   thing that voluntary cessation case law seeks to avoid you

12   would be inviting by allowing for a different standard if

13   you make the change before the pleadings close.

14       The last point I would make is on the issue of Jamie

15   Doe not being -- the, the injury not being sufficiently

16   clear.  I think it's, it's necessary to understand the

17   implications of the defendants' argument on that which would

18   essentially be plaintiffs can really not meaningfully

19   challenge curriculum under the Establishment Clause if the

20   defendants' argument is to be accepted that curriculum can

21   be changed all the time.

22       The argument's especially disingenuous in this case

23   given the long history of this program.  And, so, I think

24   it's clear student plaintiffs are entitled to challenge

25   school curriculum in their schools long enough that seven --

1   a mere seven months before they're going to encounter that

2   curriculum, especially when there's such a long-standing

3   curriculum as there is here.

4        Thank you, Your Honor.

5             THE COURT:   Thank you.

6        All right.   I'll take this matter under advisement and

7   decide it as promptly as I can.   I thank you gentlemen.

8   This was very helpful to the Court and I appreciate your

9   help.

10       (Proceedings concluded at 11:00 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, Lisa A. Cook, Official Reporter of the United

2     States District Court for the Southern District of West

3     Virginia, do hereby certify that the foregoing is a true and

4     correct transcript, to the best of my ability, from the

5     record of proceedings in the above-entitled matter.

6

7

8          s\Lisa A. Cook                         January 2, 2018

9              Reporter                                 Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25